UNITED STATES

v.

Anthony E. HAYES, Storekeeper
Third Class.

CGCM 0067.
No. 1006.

U.S. Coast Guard Court of
Military Review.

25 Aug. 1994.

Trial Counsel: LCDR H.A. Black, USCG.

Assistant Trial Counsel: LT Laticia Argenti, USCGR.

Detailed Defense Counsel: LT Daniel P. Becker, JAGC, USNR.

Individual Military Counsel: LT Karen E. Lloyd, USCGR.

Appellate Defense Counsel: LCDR Allen Lotz, USCG.

Appellate Government Counsel: LT Garland M. Walker, USCGR.

Before BAUM, BRIDGMAN, EDWARDS, FEARNOW, and O'HARA*, Appellate Military Judges, En Banc.

O'HARA, Judge:

On Saturday morning, 29 February 1992, Seaman (SN) A complained to authorities that the Appellant had taken advantage of her in her BEQ room at Coast Guard Base Honolulu, Hawaii, the night before. When the Appellant was voluntarily interviewed by special agents that same day, he eventually admitted to having engaged in sex with SN A that previous evening, but insisted that it was consensual. Then in early April, SN B came forward and stated that the Appellant had raped her in her BEQ room during the early morning hours of 22 February, a week before the incident with SN A. However, when interviewed by special agents a month earlier on 3 March as part of the investigation into allegations by SN A, SN B said nothing about having been raped, but admitted, with some reluctance, that she had sexual relations once with the Appellant in November 1991. She was recently married on 4 December and said she had not had any sexual relations with Appellant since then. When the accused was confronted by special agents on 8 April with SN B's charges, he became visibly agitated and, denying the charges,

* Judge Wiese did not participate in this decision.

terminated the interview with, "This is bullshit. I want a lawyer."[1]

Appellant's general court-martial was held on 31 August through 4 September 1992. He was tried before officer members on three offenses: the rapes of both SN A and SN B in violation of Article 120, UCMJ, 10 U.S.C. § 920, and committing adultery with SN B in violation of Article 134, UCMJ, 10 U.S.C. § 934. Appellant pled not guilty to all charges and specifications.

As with the special agents' report and the Article 32 investigation, the vast majority of the evidence adduced at the trial related to the events surrounding SN A's allegations. From the record emerges a clear picture of the lives, loves and other interactions of the Appellant and the other occupants of the BEQ on the night of 28–29 February, and it provided a comprehensive context in which to evaluate the sexual incident that both the accused and SN A agreed took place, with differences only as to certain critical specifics.

The evidence supporting the earlier incident with SN B was murkier. The facts about the incident came solely from SN B. There was no agreement that sexual activity took place on 22 February; the accused adamantly denying any sexual relations with SN B after January. The other goings-on in the BEQ that night were not recounted. Except for SN A and SN B, that night apparently did not evoke many vivid memories for the Appellant or other witnesses; it was a night like any other night. SN B did not scream or call for help. The commotion of the alleged incident went unnoticed by others in the BEQ. According to SN B, following the incident she and the accused left the room, but a little later after returning to the room, she allowed him back into the room when, according to her, he began pounding on the door just before she had to depart for galley duty. Later on in the day, SN B said she called a close friend, Fireman (FN) X, at

another Coast Guard unit on Oahu, and told her about the rape. FN X recalled a telephone conversation but not with any precision as to when it took place. SN B said she had decided to otherwise keep silent about the incident out of concern about how her husband might react to the news; her newlywed spouse supposedly had a reputation for being jealous and mercurial. It wasn't until she confided in another friend, a Health Services Technician Third Class (HS3), weeks later in early April, that the incident came to the command's attention. This was prompted when the HS3 supposedly noticed a sudden change in attitude by SN B towards the accused and the HS3 pressed her about it. SN B said that she felt then the need to tell because the accused appeared to be getting too friendly with her best friend who was in town and she didn't want the accused to do to her best friend what he had done to her.

In addition to FN X's evidence in corroboration, SN A testified that she remembered encountering SN B on the morning of 22 February walking around the barracks halls upset, tears coming down her face, carrying her big teddy bear. When asked if she was all right, SN B simply replied, "yes." However, SN B never mentioned any such encounter or even wandering the halls, much less carrying a teddy bear around after the alleged rape. She did say that following her rape she quickly departed the room and went and sat on the lanai; where, she said, that the accused eventually joined her carrying some pills and made a suicidal gesture before she chided him and returned to her room to get ready to go on duty. Later in the morning, she told SN A to check on the accused because he mentioned killing himself. SN A eventually advised the command of this which resulted in the Appellant being sent for a psychological examination on 29 February, the day SN A reported her rape. The Appellant's explanation for why he was sent for the examination was that SN B must

---

1. This evidence was not put before the court, but was contained in the special agents' report which was part of the Article 32 investigation. In view of our disposition of the case, we may consider this evidence. Article 66(c), UCMJ, 10 U.S.C. § 866(c) (The Court may "affirm only such findings of guilty ... as the [Court] finds correct in law and fact and determines, on the basis of the entire record, should be approved." Emphasis added.) & RCM 1103(b)(3)(A)(i) (requires the inclusion of Article 32 investigations as part of the record of trial in general courts-martial); *cf. U.S. v. Norris*, 33 M.J. 635 (CGCMR 1991).

have misconstrued an overheard remark while he was talking to his ex-wife on the telephone during the early evening of Friday, 21 February, but he did not acknowledge any other contact with SN B during the rest of the night.

Unlike SN B's portrait of only a single prior sexual encounter with the accused prior to her marriage, the Appellant claimed there were several relations, some adulterous, with SN B, lasting into the beginning of January. He denied ever raping SN B. Although FN X felt that SN B became uncomfortable around the Appellant, other witnesses testified that they noticed no change in SN B and that she and the Appellant remained friends after the rape supposedly occurred. She had even allowed him to sleep in her room on the night of the alleged rape of SN A, a week after her claimed rape by the accused, an event upon which both the accused and SN B agree.

Both SN B and the accused testified under oath in open court and were subject to extensive cross-examination. Both SN B's and the accused's testimony were elicited principally through leading questions; neither was permitted to provide their own narrative of the incident. Neither witness's credibility was significantly impeached during the trial.

To assist in clarifying the situation, expert testimony was brought in. The Government's expert was a social worker at a sex abuse treatment center with a master's degree in social work who was working on her doctorate in psychology. She testified that it was very uncommon for victims of acquaintance rape to fight back or to exhibit physical injuries and that after the fact some responded in a very calm, matter-of-fact fashion, while others expressed their emotions. She posited that victims may or may not avoid contact with the person who date raped them. And, other traumas can produce similar symptoms. The Defense's expert had his doctorate in psychology and was also involved with sexual counseling. He opined that primary symptoms displayed by rape victims are avoidance of bringing the event to mind and becoming socially withdrawn. In that light, he felt that victims typically stay away from persons who had anything to do with the event. But, both experts agreed that each victim is unique and the reactions to the event can vary widely. Therefore, SN B's reactions in this case could be indicative of both a rape having occurred or the fact that nothing happened.

The members acquitted the Appellant of raping SN A, but found him guilty of both raping and committing adultery with SN B on or about 22 February 1992. The military judge dismissed the adultery offense as being multiplicious with the rape conviction. During the sentencing phase of the trial, Appellant neither testified nor made an unsworn statement. The members sentenced the Appellant to be confined for two years, to be reduced to pay grade E–2, and to be discharged from the Coast Guard with a bad-conduct discharge. The convening authority approved the sentence as adjudged, notwithstanding the Appellant's plea for clemency and his request for reduction in confinement. In his request, the Appellant wrote: "I feel that this punishment was too harsh for a crime I did not committ [sic]. I am not guilty of the offenses I was charged with. This is the reason I did not accept the pretrial [sic] agreement I was offered."

This case amply demonstrates the difficulty of having to defend oneself by proving a negative (i.e., the alleged event never happened), particularly when the allegations are first raised after highly probative evidence is no longer available and witness memories have faded. The stark contrast between the two rape cases here is illustrative. SN A's notification of the command shortly after the fact caused the evidence gathering process to produce a clear portrait of the events of the evening in question to the point of giving the factfinder most of the who, what, when, where, and why of both the major and minor players in that human drama. On the other hand, SN B's almost two-month delay in telling someone in authority about her case essentially left the factfinder with just the two actors necessary for the crime, a dearth of corroboration, and an alleged event with little connection to the rest of the day-to-day real-life activities at Base Honolulu. The expert testimony on victims' reactions to date rape helped to explain the delay in notifying

those in authority, but it did not help with the loss of evidence caused by that delay.

For example, if a post-rape medical examination like the one in SN A's case had been done, we probably would have clear answers on whether there was sexual activity as described by SN B or whether there was none at all as Appellant claimed. By the time SN B decided to come forward, the highly probative evidence that such a medical examination could produce was lost through no fault of the accused's.

Another possible detriment resulting from delayed reporting of the alleged offense relates to alibi. The Government's Brief before us urges that we construe the Appellant's lack of alibi and inability to account for his whereabouts during the night of SN B's rape as supporting the guilty verdict. That fact cuts both ways.[2] Had there been immediate notification of the authorities by SN B, the accused might have been able to better retrace in his mind his steps on the night in question and been able to find corroborating witnesses before his and their memories faded. As it was, there were none for the accused and basically only FN X for SN B. This was detrimental to the Appellant, particularly when one considers the fact that both parties lived in a barracks where young-adult coed communal living provides continuous means and opportunity for sexual encounters, consensual or otherwise, making it very difficult to sort out accusations where there is a lack of corroboration on both sides. Moreover, if the accused knew that his conduct on a particular day was likely to come into question, he would be more inclined to have had the necessary alibi; the fact that he didn't have one after the passage of time is just as probative of the accused's innocence in that he never felt the need for one. The Appellant has steadfastly maintained his innocence throughout the trial and thereafter.

 Crimes do not occur in a vacuum. When the evidence indicates that the events surrounding the crime should have involved more than the perpetrator and the victim, we are not free to disregard the lack of other evidence in favor of the victim's testimony to support a finding of guilt beyond a reasonable doubt. Questions persist from missing evidence here; for example: Why did no one else in the barracks hear the purported pounding on SN B's door shortly after the crime? Why did SN B's testimony fail to mention her encounter with SN A, if in fact, it did occur as related by SN A? In the face of the alleged rape of a shipmate by the defendant just a week after her own, why didn't SN B tell those investigating SN A's rape of her own rape when they interviewed her? Why didn't the Government at the court-martial question the defendant at all about his activities before and after SN B's rape? Since the burden is on the Government to establish guilt, the Government's case bears any adverse inferences from the failure to be able to produce evidence to answer these and other questions.

Article 66(c), UCMJ, states that a Court of Military Review "may affirm only such findings of guilty ... as it finds correct in law and fact and determines, on the basis of the entire record, should be approved. In considering the record, it may weigh the evidence, judge the credibility of witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses." The case of *U.S. v. Turner*, 25 M.J. 324, 325 (CMA 1987), elaborates on this by stating: "For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced beyond a reasonable doubt." Thus, both the statute and the case law require us to consider that the trial court had the benefit of observing the witnesses. Unfortunately, we are given little guidance on how to reconcile the apparently conflicting commands to give some weight to the trial court's observations and, at the same time, to be personally convinced of the accused's guilt beyond a reasonable doubt. Application of

---

**2.** It should be noted that during the trial the accused was never really questioned about his whereabouts on the night in question. One of the members' questions did ask the accused if he recalled what he was doing between one and four in the morning, to which the accused replied that he was probably sleeping; but that was the extent of the questioning on this point.

these opposing commands to this case has divided this Court.

In his dissenting opinion, Judge Edwards states that "I find nothing in the record to cause me to believe that their [the trial court's] decision should be disturbed upon review." We believe that constitutes an overbroad construction of the statutory language, "recognizing that the trial court saw and heard the witnesses." Such an application, in our view, results in deferring to the trial court and, essentially, renders factual review by this Court illusory. On this matter, we find the analysis of Senior Judge Crean of the Army Court of Military Review in *U.S. v. Irvinspence*, 39 M.J. 893, 896 (ACMR 1994), to be helpful:

> The government urges us to defer to the credibility determination made by the original trier of fact or to at least give that determination great weight and deference. If the legislative authority or our superior court wanted this court to do more than consider the trier of fact's observation of the witnesses, they would have articulated a higher standard. We are directed merely to consider that the trier of fact observed and heard the witnesses. Since we must make our own determination of credibility, we will not defer to the findings on credibility by the trier of fact. We will consider their credibility determination after observing the witnesses as a factor in our independent determination of credibility.

■ Our interpretation is that we are not completely free to disregard the evidentiary conclusions of the factfinder below. We must factor into our analysis of the trial evidence that the original factfinder had the opportunity to actually observe and hear the witnesses. We are not required to defer to the factfinder below. Rather, we must exercise our own independent judgment, but recognize that we do not have the benefit of any demeanor evidence.[3]

The dissenting opinions express concern that we are penalizing SN B because she did not report the rape immediately and that testimony by a victim, standing alone in the absence of a prompt report, will not meet the standard for factual sufficiency. They read too much into our opinion. We are not requiring "fresh complaint", and do not mean to imply that a delay in reporting a rape makes the victim's testimony less credible. Nevertheless, delay in reporting has caused, in this case, a paucity of evidence and raised unanswered questions. It is a factor, nothing more, that had its effect on the record before us.

The critical issue before us is not merely which story is more plausible, but whether after considering all of the evidence (including the lack thereof), the Government has met its burden of proof of guilt beyond a reasonable doubt. Based on the entire record, recognizing that the trial court saw and heard the witnesses, we are not convinced that the Government has sustained its burden of proof in this case. The findings of guilty and the sentence are set aside and the charge and specification are dismissed. All rights privileges, and property of which the accused has been deprived by virtue of the findings and sentence set aside shall be restored.

Chief Judge BAUM and Judge BRIDGMAN concur.

EDWARDS, Judge (dissenting).

I respectfully dissent.

In construing the majority opinion, I do not believe there is any dispute that the test for legal sufficiency, *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), has been met. Where my brothers and I part ways is in our conclusions as to the factual sufficiency of the record to support a rape conviction.

The test our Court must use in determining factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for our not having observed the witnesses personally, we are convinced of Appellant's guilt beyond a rea-

---

3. The fact that written records of trial are silent on whether there was any significant demeanor evidence, much less whether it played a role in the factfinder's deliberations, also counsels against us speculating on how such evidence, if any, was viewed at the trial.

sonable doubt. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Turner*, 25 M.J. 324 (C.M.A.1987). The key factual question is whether the events alleged to have occurred in the early morning of 22 February 1992 actually did occur. SN B testified that they did; Appellant, that they did not.

For several reasons, I am convinced of Appellant's guilt beyond a reasonable doubt. First, contrary to the statement in the majority opinion that SN B's testimony was "elicited principally through leading questions," my review of her testimony leads me to conclude that she did testify very credibly, coherently, and, for the most part, in the normal narrative fashion. SN B was not at all uncertain about what had happened in her barracks room and she related important details such as smelling alcohol on Appellant's breath. Concededly, the record reveals that she had to be encouraged to speak up on occasion and she clearly did have difficulty describing the rape, but I do not view her hesitancy as surprising.

Both SN B and her longtime friend, FN X, testified that, shortly after the attack, SN B had telephoned FN X to tell her about it. Although FN X was not certain of the date of the telephone call, she did testify that it occurred "a week" before SN B told her about the alleged rape of SN A. SN B testified further that the reason she did not tell anyone else about the rape immediately was because of her concern about how her newlywed husband would react. Eventually, concerned that Appellant might do something similar to another woman friend, SN B advised this friend of the rape. SN B's sudden "cold" behavior towards Appellant at that time led a different friend, an HS3, to ask SN B repeatedly what the problem was. When she finally revealed the rape to this friend, he reported it to appropriate authority, which led ultimately to this conviction. Accordingly, while perhaps not "fresh complaint" in the classic sense, SN B's immediate report of the rape to FN X, and ultimate reluctant report to the HS3, help to satisfy me that she did not concoct the report of the rape.

My final reason for finding the evidence factually sufficient is based upon my understanding of the requirement that members of a court of military review must "mak[e] allowances for [their] not having observed the witnesses personally." The court-martial members who convicted Appellant were instructed properly. They *did* observe the witnesses, including both SN B and Appellant. They acquitted Appellant of the other alleged rape, but convicted him of this one. Based upon my own experience with Coast Guard court-martial panels, I am certain that this one conscientiously followed the Military Judge's instructions. They obviously had reasonable doubt about Appellant's guilt of the other rape and acquitted him. They did not have reasonable doubt about this one. I find nothing in the record to cause me to believe that their decision should be disturbed upon review.

I recognize that the members of the majority are themselves conscientiously satisfying their own responsibilities under Article 66(c), UCMJ. I must respect them for that. Nevertheless, the tone of the majority opinion leaves me with the impression that SN B is being penalized because she did not respond immediately to the rape as women are "expected" to respond after being raped. I had hoped that this kind of reasoning, in reviewing a conviction for an acquaintance rape, would not be applied following our decision in *United States v. Webster*, 37 M.J. 670 (C.G.C.M.R.1993). Regrettably, it appears that I was wrong.

FEARNOW, Judge (dissenting).

I also dissent. I believe the evidence is factually sufficient and supports a finding of guilty beyond a reasonable doubt.

As noted by Judge Edwards, the majority gives special significance to the fact that the rape was not formally reported by SN B until two months after the event. The perceived late complaint seems to cast a shadow in the eyes of the majority on all the other evidence presented and as a result they are not convinced that the evidence meets the required factual sufficiency standard.

I am not aware of any legally prescribed time requirement for a complaint of rape or

for the prosecution of such a case other than the prescribed statute of limitations. A prosecution stemming from a delayed complaint may be potentially a weaker one because of the absence of physical or forensic evidence. Nevertheless, the evidence that is presented should be considered objectively without imposing a presumption of unreliability because it does not arise from an immediate report of unlawful conduct.

By their very nature, acquaintance rape cases will often have only two direct witnesses and their testimony will be conflicting. This presents obvious difficulties for the prosecution, defense and court. The state of the evidence in these cases will always be a determining factor in whether to proceed with prosecution at all. However, we should not infer, as I believe the majority opinion does, that oral testimony by the complainant, where the complaint was not "fresh", is not capable of meeting the factual sufficiency standard. Such a standard will likely result in many "close" cases not even being sent forward for determination by a court-martial. All the evidence in these cases is entitled to full consideration and in many circumstances, as I believe it does here, can support a finding of guilty. The delay in reporting the alleged rape is a factor appropriate for evaluating the evidence but it should not be viewed as a threshold that must be overcome before other evidence is considered.